# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-01409-RMR-SBP

HAEMONETICS CORPORATION,

      Plaintiff,

v.

TERUMO BCT, INC.,

      Defendant.

---

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Susan Prose, United States Magistrate Judge**

This matter is now before the court on Defendant Terumo BCT, Inc.'s Partial Motion to Dismiss (ECF No. 58) (the "Motion" or "Motion to Dismiss"). Plaintiff Haemonetics Corporation responded to the Motion (ECF No. 63),[1] and Terumo filed a reply (ECF No. 64). The Motion is referred to the undersigned United States Magistrate Judge for a recommendation pursuant to 28 U.S.C. § 636(b)(l)(A) and Federal Rule of Civil Procedure 72(b). *See* ECF Nos. 33 (Order Referring Case), 59 (Order Referring Motion). The court has carefully considered the briefing on the Motion and the applicable law, and concludes that oral argument would not materially assist in the disposition of the Motion. The court now respectfully **RECOMMENDS** that the Motion be **DENIED** for the reasons explained below.

---

[1] Haemonetics also filed a Notice of Errata (ECF No. 91).

**BACKGROUND**

Haemonetics is a global corporation that develops and manufactures medical equipment, "including end-to-end plasma collection technologies to optimize operations for plasma centers." Second Amended Complaint, ECF No. 48 ¶ 13 ("Complaint"). Haemonetics holds patents for some of these technologies, including the patents at issue in this lawsuit. *Id.* ¶ 22. Specifically, this case involves eight patents (collectively, the "Asserted Patents" or "Patents"):[2] the '652 Patent, the '416 Patent, '926 Patent, the '934 Patent, the '124 Patent, the '916 Patent, the '873 Patent, and the '204 Patent. ECF No. 48 ¶ 1. The following facts are drawn from Haemonetics' Complaint and the attached exhibits.

The Asserted Patents describe a "blood processing system that collects plasma." *Id.* ¶ 23. The plasma collection process is known as plasma apheresis. *See* ECF No. 48-2 at 10. "Apheresis is a procedure in which individual blood components can be separated and collected from whole blood temporarily withdrawn from a subject." *Id.*

Per Haemonetics, the Patents address shortcomings with prior art plasma apheresis systems, which rely on an imprecise set of guidelines promulgated by the United States Food and Drug Association ("FDA"). ECF No. 48 ¶¶ 20-22. Those guidelines, known as the "simplified nomogram," limit the amount of blood plasma that can be collected from a donor based on three categories of donor weight. *Id.* ¶ 20; *see also Volume Limits – Automated Collection of Source Plasma (11/4/92)* (hereafter, "FDA Guidance"), https://www.fda.gov/media/70951/download (Nov. 4, 1992); *Sierra Club v. U.S. Env't Prot. Agency*, 964 F.3d 882, 893 (10th Cir. 2020)

---

[2] Initially, the case involved nine patents. *See* ECF No. 48 ¶ 1. However, Haemonetics has since withdrawn its claim for infringement of the '474 Patent. ECF No. 91.

(taking judicial notice of information on government website). During the plasma apheresis process, anticoagulant is added to the whole blood prior to feeding the blood into a blood separator, which then separates the plasma from other components. ECF No. 48-3 at 1, 7-8. However, "the osmolarity of the red blood cells prevents the anticoagulant introduced into the whole blood from entering/remaining with the red blood cells"; as a result, the anticoagulant accrues in the collection container along with the plasma, yielding the "total collection volume"—the total amount of collected plasma *and* any accrued anticoagulant. *Id.* at 1:21-53, 7:51-62. For each of the three weight classes listed in the FDA Guidance, the FDA specifies a single plasma volume limit and total collection volume limit. ECF No. 48 ¶ 20. Prior art apheresis systems are thus limited to the target collection volume prescribed by the FDA and cannot "tailor the amount of plasma that c[an] be safely taken from an individual donor." *See id.* Similarly, prior art apheresis systems "only focus[] on the full collection volume of a donation procedure—which includes both anticoagulant and blood plasma—instead of homing in on the actual blood plasma-only value." *Id.* Without knowledge of the actual amount of plasma in the collection container at any given moment, prior art systems must stop the apheresis process once the collection volume reaches the FDA limit, even if the actual amount of collected plasma is still below what can safely be collected from the donor. *See id.*

The Patents claim new apheresis systems that "utilize an individual donor's actual height, weight, and hematocrit to calculate the correct volume of plasma to be collected," within guidelines approved by the FDA. *Id.* ¶ 21. Further, the systems are "configured to calculate the volume of actual plasma within the collection container, instead of utilizing the plasma and anticoagulant volume as a base for determining when to stop the collection." *Id.* The result is "an

3

average increase in yield of 18-26 mL of plasma per donation" over systems without the

technology. *Id.*

Relevant to the instant Motion are several individual claims from the Patents. These

claims include the following independent claims: Claim 8 of the '926 Patent, Claim 23 of the

'934, Claim 7 of the '916 Patent, Claim 13 of the '873 Patent, and Claim 23 of the '204 Patent,

and the following dependent claims: Claims 17, 18, 19, 20, and 21 of the '873 Patent, and Claims

29 and 30 of the '204 Patent. ECF No. 58 at 10-12; *see also* ECF No. 48 ¶¶ 165-207, 260-370.

Claim 8 of the '926 Patent is typical of the independent claims:

A system for collecting plasma comprising:

a venous-access device for drawing whole blood from a donor and returning blood components to the donor;

a blood component separation device for separating the drawn blood into a plasma component and a second blood component, the blood component separation device having an outlet and being configured to send the plasma component to a plasma container;

a blood draw line fluidly connected to the venous-access device and configured to transport drawn whole blood to the blood component separation device, the flow through the blood draw line being controlled by a blood draw pump; an anticoagulant line connected to an anticoagulant source, the anticoagulant line configured to introduce anticoagulant into the drawn whole blood; and

a controller configured to control the operation of the blood component separation device, the controller configured to calculate (1) a volume of anticoagulant to be collected with plasma component in the plasma container, the volume of anticoagulant to be collected with the plasma component based, at least in part on the hematocrit of the donor, (2) a target volume of pure plasma to collect in the plasma container based, at least in part, on the weight of the donor, and (3) a target collection volume based, at least in part, on the calculated volume of anticoagulant and the calculated volume of pure plasma, the system configured to stop the blood draw pump when the target collection volume is collected within the plasma container.

ECF No. 48-3 at 11:20-49. Claim 20 of the '873 Patent is typical of the dependent claims:

4

A system according to claim **13,** further comprising:

> a plasma collection container weight sensor configured to monitor the volume of plasma component collected within the plasma collection container.

ECF No. 48-8 at 12:40-43.

Haemonetics asserts that Terumo infringed on the Patents by manufacturing a plasma apheresis system that included Haemonetics' patented technology. ECF No. 48 ¶¶ 56-57. As a result, Terumo "lured away" customers who previously used Haemonetics' apheresis systems "with the promise of improved plasma collection predicated on the very technology Haemonetics created and for which it obtained the Asserted Patents." *Id.* ¶ 58.

Haemonetics filed this lawsuit on May 5, 2025. ECF No. 1. In the Complaint, Haemonetics asserts nine counts of patent infringement against Terumo, though one of the claims has since been dropped. ECF No. 48 ¶¶ 59-370; ECF No. 91. Terumo filed the instant Motion on September 2, 2025, arguing that several of the independent and dependent claims in Haemonetics' patents are not directed toward patent-eligible subject matter. *See* ECF No. 58. The Motion is now fully briefed. ECF Nos. 63, 64, 91. The court examines the Parties' respective arguments below.

**LEGAL STANDARDS**

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th

Cir. 2009)). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

A plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins*, 519 F.3d at 1247 (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claims "across the line from conceivable to plausible"). The court considers exhibits to a complaint in determining whether a plaintiff has stated plausible claims. *Requena v. Roberts*, 893 F.3d 1195, 1205 (10th Cir. 2018) (citing *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)). The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

Section 101 of the Patent Act, 35 U.S.C. § 101, specifies what types of subject matter are eligible for patent protection. However, the Supreme Court has "long held" that Section 101 also "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). Whether a patent is directed to such ineligible subject matter is, "in many cases," both "possible and proper

6

to determine" on a motion to dismiss claims of infringement. *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016).

The Motion attacks several independent and dependent claims from the Asserted Patents, claims which Terumo is alleged to have infringed upon with its own apheresis system, on grounds that they are directed to abstract ideas. Specifically, Terumo argues that the claims are merely vehicles for patenting the mathematical equations that allow Haemonetics to tailor its target collection volumes to individual donors and to track the amount of plasma being collected. ECF No. 58 at 14-28. Terumo also argues that, as a threshold issue, the court should treat two of the relevant claims as representative of the remaining claims for purposes of its eligibility analysis. *Id.* at 10-12. In response, Haemonetics argues that its claims are directed to an improved plasma apheresis machine, as evidenced by their increased plasma yields. ECF No. 63 at 23-40. Haemonetics also asserts that Terumo's representative claims argument overgeneralizes the claims, and Haemonetics offers what it says is a more appropriate set of representative claims. *Id.* at 14-18. Accordingly, the court first considers whether to treat any of the independent or dependent claims as representative. Then, it considers Terumo's argument that dismissal is appropriate because the claims at issue are directed to patent-ineligible subject matter.

## I.    Representativeness of Claims

At the outset, Terumo asks this court to consider Claim 8 of the '926 Patent as representative of the independent claims and Claim 20 of the '873 Patent as representative of the dependent claims. ECF No. 58 at 10-12. Haemonetics responds with its own proffered system for identifying representative claims. ECF No. 63 at 14-18. As discussed below, the court largely agrees with Terumo, with some exceptions.

### A.      Legal Principles

"Courts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat the claim as representative." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) (citing *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016)). "Limiting the analysis of a § 101 challenge to representative claims is proper when the claims at issue are 'substantially similar and linked to the same' ineligible concept." *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1290 (Fed. Cir. 2024) (quoting *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017)). "A single claim may serve as representative for multiple asserted patents." *e-Numerate Sols., Inc. v. United States*, 149 Fed. Cl. 563, 574 (Fed. Cl. 2020).

In the context of a dispute over patent eligibility, the party challenging the patent "bears the initial burden to make a prima facie showing that the group of claims are 'substantially similar and linked to the same' ineligible concept." *Mobile Acuity*, 110 F.4th at 1290 (quoting *Cleveland Clinic*, 859 F.3d at 1360).

If the challenger meets this burden, "the burden shifts to the patent owner to present non-frivolous arguments as to why the eligibility of the identified representative claim cannot fairly be treated as decisive of the eligibility of all claims in the group." *Id.* If the patent owner fails to meet this burden, "it forfeits the right to argue that the claims in the group identified by the movant are patent eligible even if the representative claim is ultimately found to be ineligible." *Id.* at 1290. However, if the patent owner does meet its burden by presenting a "non-frivolous" argument that the eligibility of the purported representative claim does not fairly represent the

eligibility of all claims in the group, the burden shifts back to the patent challenger to prove either that:

> (i) the representative claim is, in fact, representative, in that any differences among the claims are not material to the eligibility analysis (i.e., the claims are substantially similar and are linked to the same ineligible concept); or [that] (ii) each separate claim (i.e., those not fairly represented by the purported representative claim) is ineligible for patenting.

*Id.* at 1291. Once the court identifies the representative and subsidiary claims, "[t]he two-step *Alice* framework is then applied to the representative claim or claims." *e-Numerate Sols.*, 149 Fed. Cl. at 574 (citing *Two-Way Media Ltd. v. Comcast Cable Commc'ns, L.L.C.*, 874 F.3d 1329, 1337 (Fed. Cir. 2017)).

### B.    Application

### 1.    Claim 8 of the '926 Patent

Terumo asserts that Claim 8 of the '926 Patent is representative of all independent claims; specifically, Claim 23 of the '934, Claim 7 of the '916 Patent, Claim 13 of the '873 Patent, and Claim 23 of the '204 Patent. ECF No. 58 at 10.

***Terumo's showing.*** Terumo meets its initial burden of making a prima facie showing that Claim 8 is substantially similar and linked to the same abstract idea as Haemonetics' other independent claims.

As Terumo correctly notes, each independent claim appears to describe in general terms the process of collecting plasma from a donor. *Id.* Each independent claim is titled, "A system for collecting plasma," ECF No. 48-3 at 11:20; ECF No. 48-4 at 20:7; ECF No. 48-6 at 11:32; ECF No. 48-8 at 11:50; ECF No. 48-9 at 20:16, and each claim includes several standard components of the plasma collection process, including "a venous-access device," or needle; a "blood

component separation device," or "blood separator"; a blood draw line; an anticoagulant line; and an electronic controller. ECF No. 48-3 at 11:21-49; ECF No. 48-4 at 20:9-32; ECF No. 48-6 at 11:33-61; ECF No. 48-8 at 11:51-12:7; ECF No. 48-9 at 20:17-44. Although some claims include an additional specification such as a touchscreen, *see* ECF No. 48-6 at 11:50-51, all five claims "rely on the same fundamental methods of" drawing blood, adding anticoagulant to the blood, separating the plasma, and calculating some benchmark for the amount of blood to be drawn or the amount of plasma that has been collected. *See directPacket Rsch., Inc. v. Polycom, Inc.*, No. 2024-1147, 2025 WL 1752247, at *4 (Fed. Cir. June 25, 2025) ("Irrespective of the composition of the intermediate protocol, these dependent claims rely on the same fundamental methods of employing an intermediate protocol for translation asserted in the respective independent claims."); *Accenture Glob. Servs., GmBH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344 (Fed. Cir. 2013) ("Because the [independent] claim[s] contain only 'minor differences in terminology [but] but require performance of the same basic process,' they should rise and fall together." (citation omitted) (quoting *CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1291 (Fed. Cir. 2013))); *Mobile Acuity*, 110 F.4th at 1291 ("[T]he other claims in the Asserted Patents are substantially similar to the representative claims—because the other claims' additional limitations only 'tack on generic computer components . . . or introduce conventional computer activities'—and are all directed to the same abstract idea . . . .").

Terumo also plausibly argues that all of Haemonetics' independent claims are linked to the same abstract idea: collecting a certain volume of plasma using standard equipment and calculations performable with a pen and paper. ECF No. 58 at 10-11, 14-18. Indeed, each independent claim is, by its own terms, "A system for collecting plasma," ECF No. 48-3 at

10

11:20; ECF No. 48-4 at 20:7; ECF No. 48-6 at 11:32; ECF No. 48-8 at 11:50; ECF No. 48-9 at

20:16, and each includes nearly identical equipment, steps, and processes, ECF No. 48-3 at

11:21-49; ECF No. 48-4 at 20:9-32; ECF No. 48-6 at 11:33-61; ECF No. 48-8 at 11:51-12:7;

ECF No. 48-9 at 20:17-44. Accordingly, each claim is arguably susceptible to Terumo's

fundamental criticisms: that the claims merely recite "fundamental plasma collection steps"

using "basic plasma collection equipment" and "volume calculations that can be done by a

technician." ECF No. 58 at 10-11.

*Haemonetics' response.* Although Haemonetics does offer a non-frivolous response,

Terumo has satisfied the court that there are no differences between the claims that are material

to the eligibility analysis at the motion-to-dismiss stage.

Although Haemonetics concedes that its independent claims "each recite similar

hardware," it insists that "the controller limitation in each patent is directed to different

functions." ECF No. 63 at 15. For example, Haemonetics asserts that some independent claims

specify a controller that "determine[s] an anticoagulant volume or anticoagulant ratio (among

other things) which is then used to calculate target plasma collection volume," *id.* at 15; *see also*

ECF No. 48-3 at 11:36-49, whereas other claims "instead use a donor's total plasma volume or

donor's total blood volume based on the donor's individual characteristics," such as height and

weight, "and use that total volume to determine a target collection volume," ECF No. 63 at 15;

*see also* ECF No. 48-4 at 20:25-32. In essence, Haemonetics asserts that each independent

claim's unique approach to determining the target collection volume has "'distinctive

significance' that would have a material impact on the eligibility analysis." *Mobile Acuity*, 110

F.4th at 1290 (quoting *Berkheimer*, 881 F.3d at 1365). "[T]he specific combination of claim

elements, including the determinations made and factors considered by the controller, is what allows Haemonetics' patented invention to yield optimized plasma collection volumes." ECF No. 63 at 15-16. And "the nuanced combinations of elements . . . provide different improvements over preexisting plasma collection systems." *Id.* at 16.

Haemonetics' argument misapprehends the eligibility analysis. Terumo argues that the independent claims are not patent eligible because they are directed to mathematical equations, which are not patentable, and because those equations are simple, well-known, and conventional in the art. *See* ECF No. 58 at 14-21. The variations that Haemonetics identifies among the independent claims' controller configurations are merely the alleged manifestations of different equations and their variables. *See* ECF No. 48-4 at 20:6-32 (controller "calculates a donor plasma volume" and "a target plasma volume"); ECF No. 48-6 at 11:32-61 (controller "determine[s] a target volume for plasma product and/or raw plasma"); ECF No. 48-8 at 11:50-12:6 (controller "calculate[s] a volume of pure plasma"); ECF No. 48-9 at 20:16-44 (controller "calculate[s] a target plasma amount"). Whether the controller calculates the target plasma volume using the "weight and height of the donor," ECF No. 48-9 at 20:39-44, or "weight and hematocrit," ECF No. 48-9 at 20:39-44, is immaterial to the question of whether the claim is directed to a mathematical equation. Likewise, regardless of whether the controller is configured to determine a target plasma collection volume or to determine the collected volume of pure plasma, Terumo's arguments apply equally. Haemonetics appears to believe that the claims should be grouped according to its own theory of what the claims are "directed to," *see* ECF No. 63 at 14-18, but the proper standard is whether each claim is "directed to the same abstract idea" *as alleged by Terumo*. *See Mobile Acuity*, 110 F.4th at 1291.

Nor do the minor variations in the claims' other limitations, such as having one additional pump or a touchscreen, affect the applicability of Terumo's argument that all of the claims "implement[] well-known fundamental apheresis plasma collection that technicians and systems have performed for decades using known apheresis equipment." ECF No. 58 at 20. All of the independent claims include limitations for a needle or similar device, tubing, blood separator, at least one pump, an anticoagulant source, and a controller. Haemonetics does not "refer the court to any limitations in the claims . . . that would change the court's analysis." *Mobile Acuity*, 110 F.4th at 1291; *see also id.* (accepting argument that "additional limitations only 'tack on generic computer components . . . or introduce conventional computer activities'—and all are directed to the same abstract idea").

Accordingly, the court concludes that Claim 8 of the '926 Patent is an appropriate representative claim for the independent claims and, as discussed below, two dependent claims: Claim 17 of the '873 Patent and Claim 29 of the '204 Patent.

### 2.    Claim 20 of the '873 Patent

Terumo argues that Claim 20 of the '873 Patent is representative of several other dependent claims: Claims 17, 18, 19, and 21 of the '873 Patent, and Claims 29 and 30 of the '204 Patent. ECF No. 58 at 12.

***Terumo's showing.*** Terumo meets its initial burden of showing that Claim 20 of the '873 Patent is representative of Claims 18, 19, 21, and 30.[3]

---

[3] Terumo's argument regarding the representativeness of Claim 20 hinges on the inclusion of "standard mechanical equipment used in automated plasma collection procedures to gather/supply information used in the routine collection volume calculations." ECF No. 58 at 20. In its Reply, Terumo acknowledges that Claim 17 of the '873 Patent and Claim 29 of the '204 Patent do not recite any such mechanical equipment, and it asks the court to find those claims are

Each claim "recites standard mechanical equipment used in automated plasma collection procedures to gather/supply information used in the routine collection volume calculations," *id.*; specifically, the claims all entail adding a weight sensor or pump, and/or a controller configuration to monitor the sensor or pump. ECF No. 48-8 at 12:40-43; ECF No. 48-8 at 12:27-35; ECF No. 48-8 at 12:36-39; ECF No. 48-8 at 12:44-50; ECF No. 48-9 at 21:4-7. Thus, Terumo's argument that the dependent claims, by adding only generic components, do not affect the patent eligibility analysis is equally applicable to all dependent claims.

*Haemonetics' response.* Haemonetics does not offer a non-frivolous argument in response.

Haemonetics asserts that Claim 20 is not representative of Claim 18 because Claim 18 "refers to an anticoagulant weight sensor—not a plasma collection container weight sensor." ECF No. 63 at 17. Similarly, it contends that Claim 19 "recites a different function entirely: a controller configured to monitor the operation of an anticoagulant pump." *Id.* To the first point, the difference between a weight sensor measuring coagulant and one measuring the collection container is immaterial to Terumo's argument that the dependent claims merely add conventional components to the claimed system. And to the second, Claim 19 indeed adds a "standard [piece] of mechanical equipment" to Claim 13—an anticoagulant pump. *See* ECF No. 48-8 at 11:50-12:6

---

adequately represented by Claim 8 of the '926 Patent for the same reasons explained in the preceding section. *See* ECF No. 64 at 3 n.1. Although Terumo's argument is spare at best, the court independently finds that Claim 8 is an appropriate representative clime for Claim 17 and Claim 29. Claim 17 describes an alternative controller configuration, ECF No. 84-8 at 12:20-26; thus, Terumo's argument that the independent claims are directed to conventional equations via the controller limitation is equally applicable to Claim 17. Likewise, Claim 29 simply restates the concept that the target plasma amount will be based on personalized parameters such as height, weight, and hematocrit, ECF No. 84-9 at 21:1-3, which implicates the same issue: an allegedly conventional equation applied to an otherwise standard plasma apheresis system.

(not listing an anticoagulant pump among limitations of Claim 13). However, regardless of whether the pump is monitored by a controller, Terumo's argument that the addition is conventional applies with equal force.

## II.    Patent Eligibility

Terumo next argues that the asserted claims are directed toward patent-ineligible subject matter: mathematical equations. ECF No. 58 at 13-27. It claims that all of Haemonetics' claimed systems offer only a single innovation in that they use simple mathematical equations, as well as basic equipment, to determine a target volume of plasma to collect and to track the volume of plasma present in the total collection volume. *Id.* at 13-18, 21-25. Thus, Terumo argues that the systems are directed to a mathematical equation, which is a patent-ineligible subject matter under step one of *Alice*. *Id.* Further, Terumo asserts that these equations and methods are conventional and well-known in the field of apheresis. *Id.* In response, Haemonetics argues that the Patents are directed to an improved plasma apheresis system. ECF No. 63 at 18-35. In support, it points to the fact that its devices provide a significant increase in the yield of plasma per donor. *Id.*

### A.    Legal Principles

The exceptions to Section 101 of the Patent Act—"[l]aws of nature, natural phenomena, and abstract ideas"—represent "the basic tools of scientific and technological work." *Alice*, 573 U.S. at 216 (quoting *Molecular Pathology*, 569 U.S. at 589). "'[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71 (2012)). Accordingly, courts must distinguish between patents that claim the "building blocks of human ingenuity and those

that integrate the building blocks into something more." *Id.* at 217 (quoting *Mayo*, 566 U.S. at 89).

To that end, the Supreme Court has "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Id.* The *Alice* test is comprised of two consecutive steps. First, courts must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* If the answer is "yes," courts "then ask, '[w]hat else is there in the claims before us?'" *Id.* In answering this second question, courts must "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* (internal quotation marks omitted). Put another way, step two of the *Alice* test directs this court to consider whether a claim at issue discloses an "inventive concept," i.e., an element or combination of elements that is sufficient to transform an abstract idea into a patent-eligible application of that idea. *See Vehicle Intell. & Safety, LLC v. Mercedes-Benz USA, LLC*, 635 F. App'x 914, 917 (Fed. Cir. 2015). In *Alice*, the Supreme Court clarified that "wholly generic computer implementation is not generally the sort of 'additional feature' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Alice*, 573 U.S. at 223-24 (quoting *Mayo*, 566 U.S. at 77 (alterations omitted)).

Subject matter eligibility under § 101 may be determined at the Rule 12(b)(6) stage of a case. *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019). "[H]owever, [dismissal] is appropriate 'only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.'" *Id.* (quoting *Aatrix Software, Inc. v. Green*

*Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018)).

  **B.**  **Application**

  ***Step one.*** At step one of the *Alice* test, a court must first "determine whether the claims at issue are directed to a patent-ineligible concept." *Id.* (citation omitted). To do this, the court must look "at the 'focus' of the claims [and] their 'character as a whole.'" *Elec. Power Grp.*, 830 F.3d at 1353. An idea is abstract if it has "no particular concrete or tangible form." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014). The *Alice* court expressly declined to "labor to delimit the precise contours of the 'abstract ideas' category." 573 U.S. at 221. "An abstract idea might be a 'preexisting, fundamental truth' like a mathematical equation, or even a 'method of organizing human activity' or 'longstanding commercial practice,' like hedging risk or using intermediaries to settle transactions." *HealthTrio, LLC v. Aetna, Inc.*, No. 12-cv-03229-REB-MJW, 2015 WL 4005985, at *3 (D. Colo. June 17, 2015) (quoting *Alice*, 573 U.S. at 220), *report and recommendation adopted*, 2015 WL 5675303 (D. Colo. Sep. 28, 2015). As an example of an abstract idea, the Federal Circuit invalidated claims directed toward the "collection and organization of data." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011). "In determining the eligibility of [a] claimed process for patent protection under § 101, the[] claims must be considered as a whole." *Diamond v. Dehr*, 450 U.S. 175, 188 (1981).

  The Federal Circuit has recognized that, "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *ChargePoint*, 920 F.3d at 765 (citation omitted). Thus, at step one, "it is not enough to merely identify a patent-ineligible concept underlying the claim; [the court] must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Id.* (citing *Thales Visionix Inc. v. United States*, 850

17

F.3d 1343, 1349 (Fed. Cir. 2017)). Furthermore, "patents granted by the Patent and Trademark Office are presumptively valid." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019).

The Federal Circuit has identified several "familiar class[es] of claims" which are often directed to patent-ineligible concepts. *In re Killian*, 45 F.4th 1373, 1382 (Fed. Cir. 2022). For example, "claims that 'simply demand[ ] the production of a desired result . . . without any limitation on how to produce that result' are directed to an abstract idea."[4] *Id.* (quoting *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1345 (Fed. Cir. 2018)). Additionally, if the claim's steps involve mental processes that "can be performed in the human mind, or by a human using a pen and paper," then "the claim is for a patent-ineligible abstract idea." *Id.* (quoting *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020)). Finally, "'[i]nformation as such is an intangible'; accordingly, 'gathering and analyzing information of a specified content, then displaying the results' without 'any particular assertedly inventive technology for performing those functions' is an abstract idea.'" *Id.* (quoting *Elec. Power Grp.*, 830 F.3d at 1353-54).

On the other hand, "generally, if a claim is directed to a specific technological solution to a technological problem, it is not directed to an abstract idea." *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1100 (Fed. Cir. 2021) (Reyna J., concurring). However, "there is

---

[4] A "meaningful limitation," in the context of computer-related tasks, is one "that would improve a computer as a tool" rather than "merely recite routine and conventional steps in carrying out the well-established practice of accessing data from an external source and displaying that data on a user's device." *Interval Licensing*, 896 F.3d at 1345. "[A]cquiring and organizing information" and "displaying the information which results from that collection and organization" are "nothing more than generic, pre-existing computer functionalit[ies]." *See id.* (citation omitted).

18

a critical difference between patenting a particular concrete solution to a problem and attempting to patent the abstract idea of a solution to the problem in general." *Elec. Power Grp.*, 830 F.3d at 1356 (citation omitted). "Whereas patenting a particular solution would incentivize further innovation in the form of alternative methods for achieving the same result . . . allowing [generalized] claims . . . would inhibit innovation by prohibiting other inventors from developing their own solutions to the problem without first licensing the abstract idea." *Id.* (citation omitted). For software solutions, claims "that are directed to a specific improvement to computer functionality" are not directed to patent-ineligible subject matter, whereas claims which recite the "use of an abstract mathematical formula on any general purpose computer" or that recite "generalized steps to be performed on a computer using conventional computer activity" or that otherwise invoke computers "merely as a tool" are directed to patent-ineligible subject matter. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336, 1338 (Fed. Cir. 2016). Further, "the need to perform tasks automatically is not a unique technical problem." *Cellspin*, 927 F.3d at 1316 (citing *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015)).

"The predominant question at step one of the *Alice* analysis is to identify the appropriate level of abstraction at which to analyze the claims to determine whether they are directed to unpatentable subject matter." *Energy Env't Corp. v. City & Cnty. of Denver*, No. 21-cv-02235-PAB-SBP, 2024 WL 1300267, at *11 (D. Colo. Mar. 26, 2024). Courts must "tread carefully in construing th[e] exclusionary principle lest it swallow all of patent law." *Alice*, 573 U.S. at 217.

Applying the foregoing principles of law, the undersigned agrees with Terumo that Claim 8 is directed to the real-time tracking of pure plasma collection, which is an abstract—and

patent-ineligible—idea.[5] ECF No. 58 at 20. The broad, functional language of Claim 8 compels this conclusion. Claim 8, like the other independent claims, reflects an assemblage of conventional apheresis components—a "venous access device," tubing, a pump, a blood separator, and a collection container[6]— coupled with a "controller," to complete the apheresis process. ECF No. 48-3 at 11:20-49; *see also, e.g.*, ECF No. 48-4 at 20:7-32 (Claim 23 of '934 Patent); ECF No. 48-6 at 11:32-61 (Claim 7 of '916 Patent). Moreover, each of these components operates in a conventional way. The venous access device is used to "draw[] whole blood from a donor and return[] blood components to the donor"; the blood separator is used to "separat[e] the drawn blood into a plasma component and a second blood component"; tubing is connected to the venous access device and to an anticoagulant source and is "configured to transport drawn whole blood to the" blood separator and to "introduce anticoagulant into the drawn whole blood"; and the pump "control[s]" the blood draw line. ECF No. 48-3 at 11:20-35. The claim "predominantly describes the system and methods in purely functional terms"; that is, "the functions of [the components] are described in vague terms without any meaningful limitations." *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016).

The only distinguishing factor in each of the independent claims is the addition of a "controller," which, in Claim 8's case, calculates the "volume of anticoagulant to be collected with plasma component in the plasma container," the "target volume of pure plasma to collect," and the "target collection volume," which is the combined volume of anticoagulant and plasma

---

[5] The court notes that other independent claims are directed to calculating a target plasma volume based on the height, weight, and hematocrit of a donor, *e.g.*, ECF No. 84-4 at 20:7-32; however, the Claim 8 analysis equally applies to those claims.

[6] Claim 7 of the '916 Patent adds a second pump and a touchscreen. ECF No. 84-6 at 11:32-61.

in the collection container. *Id.* at 11:36-49; *see also, e.g.*, ECF No. 48-6 at 11:32-61 (Claim 7 of '916 Patent). But where a claim's innovation involves "the use of [a] computer[] as a tool" rather than "an improvement to computer functionality," then the claim is "directed to an abstract idea." *See Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 703 (Fed. Cir. 2023). Likewise, "if a claim is directed essentially to a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, the claimed method is nonstatutory." *Parker v. Flook*, 437 U.S. 584, 595 (1978) (quoting *In re Richman*, 563 F.2d 1026, 1030 (C.C.P.A. 1977)).

Haemonetics argues that Claim 8, as well as its other claims, "are specifically directed to a 'machine[,]' which is patent eligible subject matter under 35 U.S.C. § 101." ECF No. 63 at 24. Respectfully, the court is unpersuaded by Haemonetics' contention that Claim 8, by reference to a machine and its components, is "directed to" a machine for purposes of § 101. It is well established that a device which "merely invoke[s] generic processes and machinery" can be "directed to a result that itself is the abstract idea." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020) (quoting *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016)); *see also, e.g.*, *id.* (cardiac monitoring device); *Concaten, Inc. v. Ameritrak Fleet Sols., LLC*, 131 F. Supp. 3d 1166, 1169-70 (D. Colo. 2015), *aff'd*, 669 F. App'x 571 (Fed. Cir. 2016) ("smart modem device"); *Vehicle Intell.*, 635 F. App'x at 916 (driver screening device). "[A]rguing that the claimed methods are tied to particular machines . . . is no longer sufficient to render a claim patent-eligible." *Vehicle Intell.*, 635 F. App'x at 919. Rather, the claim must "focus on a specific means or method that improves the relevant technology." *CardioNet*, 955 F.3d at 1368 (quoting *McRO*, 837 F.3d at 1312). Thus, "[w]hile [Claim 8] requires concrete, tangible components such as" a venous access device, blood separator, and

21

controller, the claim's broad and nonspecific language "makes clear that the recited physical components merely provide a generic environment in which to carry out the abstract idea of" tracking the amount of plasma in a plasma apheresis system's collection container at any given time. *In re TLI Commc'ns*, 823 F.3d at 611.

This conclusion is borne out by the specification, which reveals that the claim's components operate in essentially the same manner as prior art plasma apheresis systems. Per the specification, a "typical[]" plasma collection system operates as follows: (1) blood is withdrawn; (2) anticoagulant is added to the whole blood; (3) the blood is fed into a blood separator, which separates the plasma; (4) the plasma is collected; and (5) the other blood components are returned to the donor's body. ECF No. 48-3 at 1:21-31. So too does the claimed system. *Compare id., with id.* at 11:20-49. Further, in both prior art systems and the claimed system, "because the osmolarity of the red blood cells prevents the anticoagulant from mixing with it, essentially all of the anticoagulant exits the bowl and is collected within the plasma collection container along with the plasma." *See id.* at 8:26-31. Thus, the fundamental distinction between the claimed system and prior art systems is that, previously, apheresis systems did not track the percentages of plasma and anticoagulant in the collection container; instead, they stopped withdrawing blood when the collection container reached a total collection volume limit, which is set by the FDA based on the donor's weight. *Id.* at 1:43-53. In contrast, the claimed system uses common biological parameters such as weight to determine a target plasma volume, *see id.* at 2:46-47; then, the system inputs the donor's hematocrit and the amount of anticoagulant added to the system into an equation, which yields the percentage of anticoagulant, and thus plasma, within the collection container. *Id.* at 8:15-37. As a result, the claimed system tracks the amount

22

of plasma in the collection container, rather than the gross volume of the container, and can thus continue collecting until the desired amount of plasma, as determined by bodily characteristics, is obtained. *See id.* at 4:17-27. Fundamentally then, the claim is directed to the equations that yield the target plasma volume and plasma collection volume.

Haemonetics argues that its claims are analogous to claims that the Federal Circuit has found to be directed to patent-eligible subject matter. ECF No. 63 at 20-22. Specifically, Haemonetics points to *CardioNet*, 955 F.3d 1358, and *Ecoservices, LLC v. Certified Aviation Services, LLC*, 830 F. App'x 634 (Fed. Cir. 2020), to illustrate its point. ECF No. 63 at 20-22. But those cases are distinguishable and, in fact, support this court's conclusion that at Claim 8 is directed to an abstract idea.

*CardioNet* involved a claim to a cardiac monitoring device that detected both the beat-to-beat timing of cardiac activity and premature ventricular beats, which it then used to diagnose atrial fibrillation and atrial flutter. 955 F.3d at 1368. The Federal Circuit's conclusion that the claim was "directed to an improved cardiac monitoring device" was largely compelled by the specificity of the language in the limitations themselves, which each played an innovative part in the system. *See id.* at 1368-69. The limitations identified the unique role of each system component—for example, "a beat detector to identify a beat-to-beat timing of cardiac activity" and "a ventricular beat detector to identify ventricular beats in the cardiac activity"—and described how they worked together to achieve the desired result—identifying "when the variability in the beat-to-beat timing is . . . relevant to . . . atrial fibrillation and atrial flutter in light of the variability in the beat-to-beat timing caused by ventricular beats identified by the ventricular beat detector." *See id.* at 1365. Taken together, "the claims 'focus[ed] on a specific

23

means or method that improve[d]' cardiac monitoring technology," rather than "invok[ed] generic processes and machinery" to claim "a result or effect that itself [was] the abstract idea." *Id.* at 1368. In contrast, the limitations in Claim 8 state in broad terms the process of withdrawing whole blood, adding anticoagulant, separating the plasma, collecting the plasma, and returning the nonplasma constituents to the donor. ECF No. 48-3 at 11:20-49. Indeed, the only limitation with any level of specificity as to its role in increasing plasma yield is the controller, which identifies a target collection volume and monitors the amount of plasma collected. *Id.* at 11:36-49. Claim 8 "fails to provide any technical details for the tangible components," *In re TLI Commc'ns*, 823 F.3d at 612, which compels the conclusion that it is directed to "calculat[ing] . . . [the] volume of anticoagulant to be collected," the "target volume of pure plasma," and the "target collection volume." ECF No. 48-3 at 11:36-49. And of course, "a method of calculation" by itself falls outside the realm of patent eligibility. *See Flook*, 437 U.S. at 595.

*Ecoservices*, which involved a claim to "[a] system for washing turbine engines," is similarly distinguishable. 830 F. App'x at 636, 642-45. In that case, the Federal Circuit rejected the argument that the claims were directed to "the idea of using a computer to replace human operators in a known process," noting that the claims were "directed to a specific combination of a type of washing unit, information detector, and control unit, configured in a certain way" that "achieve[d] a level of automation that provides an improvement over the prior art of human-operated washing systems." *Id.* at 642-43. In contrast here, Claim 8 provides little to no specificity as to any of the individual components; it does not even identify a particular type of "venous access device." ECF No. 48-3 at 11:20-49. As such, aside from the controller, one cannot divine what unique role each component plays in the claimed system that it does not also

play in an identical capacity in traditional apheresis systems. Indeed, the specification appears to confirm that these components operate in precisely the same manner in the claimed system as they do in traditional systems. *Compare id.* at 1:21-31*, with id.* at 11:20-49. Thus, substantively speaking, they are mere surplusage, a cast of minor and inconsequential characters that exist for the sole purpose of supporting the controller, which of course operates as any generic computer would.

Further, the dependent claim limitations do not change the focus of the asserted claims. Terumo argues that Claim 20, by adding only "generic mechanical equipment" to the claimed system, cannot render it patent eligible. ECF No. 58 at 13, 21-25. Terumo insists that the referenced equipment—"a plasma collection container weight sensor"—fails step one of *Alice* because it is "merely a tool to carry out [the claim's] abstract idea of calculating the volume of pure plasma in real time." *Id.* at 21-23. Haemonetics responds that the dependent claims are directed to patent-eligible subject matter because "they further specify the physical features or operation of the device[.]" ECF No. 63 at 29 (quoting *CardioNet*, 955 F.3d at 1369).

Whether Haemonetics adds a "weight sensor" to weigh plasma product or a new controller configuration to count pump rotations, neither is sufficient to render the underlying system eligible. Its dependent claims merely "disclose the use of an 'already available [technology], with [its] already available basic functions, to use as [a] tool[] in executing the claimed process.'" *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1214 (Fed. Cir. 2025) (alterations in original) (quoting *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1169-70 (Fed. Cir. 2018)). And "the use of 'conventional or generic technology' cannot alone constitute a technological improvement." *Trs. of Columbia Univ. v. Gen Digital Inc.*, 169 F.4th 1320, 1329

25

(Fed. Cir. 2026) (quoting *In re TLI Commc'ns*, 823 F.3d at 612). A weight sensor, or scale, is undoubtedly a conventional piece of technology, and it is conventionally deployed, as here, to measure weight. No matter how many such sensors are deployed, their function is the same: "gathering and analyzing information of a specified content, then displaying the results." *Elec. Power Grp.*, 830 F.3d at 1354. And as long as there is "not any particular assertedly inventive technology for performing those functions," their inclusion is "directed to an abstract idea." *Id.*; *cf. iLife Techs., Inc. v. Nintendo of Am., Inc.*, No. 3:13-cv-4987-M, 2020 WL 13281800, at *3 (N.D. Tex. Jan. 17, 2020), *aff'd*, 839 F. App'x 534 (Fed. Cir. 2021) ("[C]laim 1 is not directed to an improvement in the functionality of sensors and processors. For example, the claim does not disclose any improvement in the sensor's ability to collect information, such as collecting previously unknown information or collecting information more accurately."); *TDE Petroleum Data Sols., Inc. v. AKM Enters., Inc.*, 657 F. App'x 991, 993 (Fed. Cir. 2016) ("[C]laims generally reciting 'collecting information, analyzing it, and displaying certain results of the collection and analysis' are 'a familiar class of claims directed to a patent ineligible concept.'" (cleaned up) (quoting *Elec. Power Grp.*, 830 F.3d at 1353)); *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1018 (Fed. Cir. 2017) ("[T]he asserted claims recite no more than the sort of 'perfectly conventional' generic computer components employed in a customary manner that we have previously held insufficient to transform the abstract idea into a patent-eligible invention" (citing *Intellectual Ventures I v. Symantec Corp.*, 838 F.3d 1307, 1321 (Fed. Cir. 2016))).

The specification further confirms that the dependent claims "'[s]imply append[] conventional steps, specified at a high level of generality,' which are 'well known in the art' and

26

consist of 'well-understood, routine, conventional activit[ies]' previously engaged in by workers in the field." *Symantec Corp.*, 838 F.3d at 1313 (quoting *Alice*, 573 U.S. at 221-22). The claimed system purports to improve upon prior art systems' reliance on total collection volume in determining when to end collection. ECF No. 48-8 at 1:49-62. Haemonetics asserts that Claim 20 facilitates this advancement by adding a "weight sensor configured to monitor the volume of plasma component collected within the plasma container." *Id.* at 12:40-43. But there is an obvious fault with this claim. Specifically, both the claimed system *and* prior art systems rely on measuring the collection volume to determine when to end collection. Thus, the weight sensor in Claim 20 merely automates what was a routine, conventional step in prior art systems. "But the need to perform tasks automatically is not a unique technical problem" sufficient to direct the claimed system to a nonabstract technological improvement. *Cellspin*, 927 F.3d at 1316. Similarly, the addition of a weight sensor or pump to the coagulant container, even if it deploys those components "in a new environment," does render the claims' direction nonabstract; "[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment." *Recentive Analytics*, 134 F.4th at 1213 (alteration in original) (quoting *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015)).

In sum, the undersigned concludes that both the independent and dependent claims are directed to abstract ideas: calculating target plasma volumes and the real-time monitoring of collected plasma.

***Step two.*** Having determined that the asserted claims are directed to an abstract idea, the court must determine whether they include "additional features to ensure that the claim[s] [are]

more than a drafting effort designed to monopolize the abstract idea." *Alice*, 573 U.S. at 221

(quoting *Mayo*, 566 U.S. at 77).

"To answer [this] second question, [the court] consider[s] the limitations of each claim

both individually and as an ordered combination to determine whether the additional limitations

transform the nature of the claim into a patent-eligible application of a patent-ineligible concept."

*Versata Dev. Grp., Inc. v. SAP Amer., Inc.*, 793 F.3d 1306, 1332 (Fed. Cir. 2015), *abrog. on other*

*grounds recognized in SIPCO, LLC v. Emerson Elec. Co.*, 980 F.3d 865 (Fed. Cir. 2020). "The

second step in the analysis requires us to determine whether the claims do significantly more

than simply describe that abstract method." *Ultramercial*, 772 F.3d at 715 (citing *Mayo*, 566 U.S.

at 77). The Supreme Court has described step two of the patent eligibility analysis as "a search

for an inventive concept—i.e., an element or combination of elements that is sufficient to ensure

that the patent in practice amounts to significantly more than a patent upon the [ineligible

concept] itself." *Alice*, 573 U.S. at 217-18 (alteration in original). The "inventive concept" is

lacking where "each step does no more than require a generic computer to perform generic

computer functions." *Id.* at 225. Instead, there must be "additional features" that "provide

practical assurance that the process is more than a drafting effort designed to monopolize the

[abstract idea] itself." *Mayo*, 566 U.S. at 77. "[T]he second step of the *Alice*/*Mayo* test is

satisfied when the claim limitations 'involve more than performance of "well-understood,

routine, [and] conventional activities previously known to the industry."'" *Aatrix Software*, 882

F.3d at 1128 (quoting *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,

776 F.3d 1343, 1347-48 (Fed. Cir. 2014))); *see also Affinity Labs of Tex., LLC v. DIRECTV, LLC*,

838 F.3d 1253, 1262 (Fed. Cir. 2016) (holding that the features constituting the inventive concept

in step two of *Alice*/*Mayo* "must be more than 'well-understood, routine, conventional activity'"

(quoting *Mayo*, 566 U.S. at 79–80)); *Erie Indem. Co.*, 850 F.3d at 1328 (same); *Bascom Glob.*

*Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) ("[I]t is of

course now standard for a § 101 inquiry to consider whether various claim elements simply

recite 'well-understood, routine, conventional activit[ies].'" (quoting *Alice*, 573 U.S. at 225)).

However, "[w]hether the claim elements or the claimed combination are well-understood,

routine, [and] conventional is a question of fact." *Aatrix Software*, 882 F.3d at 1128. Although it

is true "that patent eligibility can be determined at the Rule 12(b)(6) stage," *id.* at 1125 (citing

*Genetic Techs.*, 818 F.3d at 1373), "[t]his is true only when there are no factual allegations that,

taken as true, prevent resolving the eligibility question as a matter of law." *Id.*; *see also Ivanti,*

*Inc. v. Patch My PC, LLC*, 669 F. Supp. 3d 1109 (D. Colo. 2023) (noting that dismissal "at this

early stage . . . is appropriate 'only when there are no factual allegations that, taken as true,

prevent resolving the eligibility question as a matter of law'" (ellipsis in original) (quoting

*ChargePoint*, 920 F.3d at 765)). "[A]llegation[s] about inventiveness, wholly divorced from the

claims or the specification, [will not] defeat[] a motion to dismiss," but "plausible and specific

factual allegations that aspects of the claims are inventive are sufficient" to survive the Rule

12(b)(6) stage. *Cellspin*, 927 F.3d at 1317 (citing *Aatrix Software*, 882 F.3d at 1128); *see also*

*Aatrix Software*, 882 F.3d at 1126-27 ("[P]atentees who adequately allege their claims contain

inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." (citing *Bascom*, 827

F.3d at 1352)).

Terumo argues that Claim 8 lacks any inventive concept because it "discloses basic

calculations for determining the amount of pure plasma to collect/collected during a procedure

based on FDA Guidance that has been around for more than thirty years." ECF No. 58 at 20 (citing FDA Guidance). The FDA Guidance announces the agency's nomogram for permissible plasma collection and total collection volumes for donors based on weight, FDA Guidance at 2-3, the same volumes that form the basis of prior art apheresis systems' target collection volumes and which Haemonetics purports to have improved upon as part of the claimed system. *See* ECF No. 48-3 at 1:40-53. Before describing the nomogram, the FDA discusses current (as of November 1992) practices for determining target collection volumes: "Current considerations in determining the volume of plasma to be collected include sex, height, weight, hematocrit, and in some centers, the length of time in process or the number of cycles." FDA Guidance at 1.

In Terumo's view, the FDA's statement reveals that one of the most fundamental alleged innovations in the claimed system—the ability to tailor a target collection volume to an individual donor based on height, weight, and hematocrit—is well-understood, routine, and conventional. ECF No. 58 at 20-21. Further, Terumo argues that the remaining claimed innovations—the mathematical equations that allow tracking the amount of plasma collected—"may be performed by a technician," and thus cannot supply an inventive concept. *Id.* at 19; *see also OIP Techs.*, 788 F.3d at 1363 ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible."). Finally, Terumo argues that Claim 8's limitations, whether considered "individually or as an ordered combination, recite the fundamental concepts of plasma collection procedures" and thus "do not amount to significantly more than well-understood, routine, and conventional concepts previously known in the industry." ECF No. 58 at 20-21.

After carefully reviewing the briefing on the Motion and Haemonetics' pleading, the undersigned respectfully concludes that the Complaint includes well-pled allegations plausibly establishing that the combination of elements in Claim 8 is not well-understood, routine, or conventional. The Complaint states that "[t]he elements claimed by the Asserted Patents, taken alone or in combination, were not well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention," but rather "teach unconventional methods and systems" that "increase efficiency of the claimed plasma collection systems, resulting in more plasma collected, on average, per-donation, increasing the amount of donated plasma and availability of its components for life saving therapies, [and] ensuring accuracy in the volume of plasma that is collected." ECF No. 48 ¶ 24. These allegations align with Claim 8's specification, which explains how the claimed system improves upon prior art apheresis systems. *See* ECF No. 48-3 at 1:21-53. The specification thus lends "facial plausibility" to Haemonetics' claims and "allows the court to draw the reasonable inference that" Claim 8 includes an innovative concept. *See Iqbal*, 556 U.S. at 678. Together, these facts, which the court must accept as true, are sufficient to "nudge[] [Haemonetics'] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Accordingly, the Motion to Dismiss must be denied. *Aatrix Software*, 882 F.3d at 1130.

That Terumo has marshalled some evidence indicating that the innovations claimed in Claim 8 are well-known and longstanding merely highlights "factual disputes underlying the § 101 analysis." *See id.* at 1126. Notably, however, the FDA Guidance says nothing about *how* height, weight, and hematocrit factor into calculating a target volume. *See* FDA Guidance at 2.

31

Thus, whether the '926 Patent's eligibility is foreclosed by longstanding practices in the

apheresis industry is a question that should be resolved following further factual development.

**CONCLUSION**

For the reasons explained above, it is respectfully **RECOMMENDED** that Defendant

Terumo BCT, Inc.'s Partial Motion to Dismiss (ECF No. 58) be **DENIED**.[7]

DATED: August 7, 2026                    BY THE COURT:

_____
Susan Prose
United States Magistrate Judge

---

[7] Rule 72 of the Federal Rules of Civil Procedure provides that within fourteen (14) days after service of a Magistrate Judge's order or recommendation, any party may serve and file written objections with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. §§ 636(b)(1)(A), (B); Fed. R. Civ. P. 72(a), (b). Failure to make any such objection will result in a waiver of the right to appeal the Magistrate Judge's order or recommendation. *See Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 783 (10th Cir. 2021) (firm waiver rule applies to non-dispositive orders); *but see Morales-Fernandez v. INS*, 418 F.3d 1116, 1119, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review, including when a "pro se litigant has not been informed of the time period for objecting and the consequences of failing to object").